UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NADINE E. LIMA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 17-156MSM |
| | : | |
| CITY OF EAST PROVIDENCE, by and | : | |
| through its Finance Director, Malcom | : | |
| Moore, and CITY OF EAST | : | |
| PROVIDENCE SCHOOL | : | |
| DEPARTMENT, by and through its | : | |
| Superintendent, individually and in her | : | |
| official capacity, KATHRYN CROWLEY, | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In 2014, Plaintiff Nadine E. Lima, a long-time East Providence elementary school

principal, sued the East Providence School Department and its then-Superintendent, Kim Mercer,

alleging that, as an African American, she had been denied promotion due to race discrimination

and due to East Providence's failure to comply with the contractual requirement that it have an

affirmative action officer and an affirmative action committee. Lima v. East Providence, C.A.

14-513ML (D.R.I.) ("2014 Case"). The 2014 Case settled in November 2015 pursuant to an

agreement that included, *inter alia*, the contractual requirements that the School Department

would provide a statement of intent not to retaliate against Plaintiff and that it would create an

affirmative action position.

When Plaintiff returned to full-time work in January 2016 following a leave pursuant to

the Family and Medical Leave Act ("FMLA"), the East Providence School District had just

started a new Superintendent (Defendant Kathryn Crowley), supported by a new team of senior

leaders, including a new assistant superintendent/affirmative action officer, Dr. Celeste Bowler,

an African American woman with four years of experience as an affirmative action officer in a Massachusetts school district. After her return, Plaintiff took umbrage at various actions taken by the new leadership team (including a substandard review of Plaintiff's job performance), which culminated in the Department's decision to transfer Plaintiff from her position as principal of an elementary school to a newly created position as principal of the to-be-launched Pre-Kindergarten ("Pre-K") program for the School Department. In June 2016, Plaintiff took a new FMLA leave and in August 2016, she resigned and moved to Florida.

In April 2017, Plaintiff filed this case. This time she named as defendants Superintendent Crowley, individually and in her official capacity, the City of East Providence and its School Department. The gravamen of the new case is that, improperly animated by the 2014 Case, her FMLA leaves and her race, the School Department and Superintendent Crowley retaliated against Plaintiff by taking various adverse employment actions and creating a hostile work environment (resulting in her constructive discharge); she also alleges that the retaliation and the appointment of Dr. Bowler as the affirmative action officer are both in breach of the 2015 Settlement Agreement that terminated the 2014 Case.

After the parties concluded discovery, Defendants moved for summary judgment, arguing that the facts are largely undisputed and do not sustain Plaintiff's burden of demonstrating a trial-worthy *prima facie* case in that there is no evidence that she was subjected to any adverse employment actions, as well as that Plaintiff has presented no rebuttal to the proof demonstrating that all of the challenged actions were taken for legitimate, nondiscriminatory reasons. Defendants also ask for summary judgment on Plaintiff's breach of contract claims because her evidence not only fails to demonstrate any actions amounting to retaliation but also establishes that the School Department complied with its contractual duty in appointing Dr. Bowler as

affirmative action officer.  Defendants' motion for summary judgment has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, I recommend that it be granted.

## I.     BACKGROUND[1]

From August 2000 until August 2016, Plaintiff was a principal for the East Providence School District.  PSUF ¶ 21.[2]  Since the 2012-2013 school year, when not on FMLA leave, she was principal of the Whiteknact Elementary School ("Whiteknact").  ECF No. 14-1 at 6 ¶ 4; see ECF No. 22-3 at 7-8.  On August 2, 2016, Plaintiff resigned; she alleges that she was constructively discharged.  DSUF ¶ 46.

*2014 Case*.  On November 17, 2014, Plaintiff filed the 2014 Case in Providence County Superior Court against East Providence, its School District and its then-Superintendent, Kim Mercer; Defendants removed the case to this Court.  In the 2014 Case, Plaintiff alleged that, in 1990, she had applied for various positions in the East Providence School Department but was not hired.  Based on a charge filed with the Rhode Island Commission for Human Rights, her allegations of discriminatory hiring resulted in a 1994 reconciliation agreement requiring East Providence not to retaliate against her, to appoint an affirmative action officer, to use specified hiring procedures and to maintain an affirmative action committee to monitor an affirmative action plan.  ECF No. 14-1 at 6-7 ¶¶ 9-10.  According to the 2014 Case complaint, almost twenty-five years later, in 2013, Plaintiff again applied for various School Department positions

---

[1] Except as otherwise indicated, this background statement is drawn from the parties' statements.  See ECF No. 14 (Defendants' Statement of Undisputed Facts, "DSUF"); ECF No. 22 (Plaintiff's Statement of Undisputed Facts, "PSUF").  Citations to the attachments to the statements are based on the ECF reference.  Although the statements reference deposition testimony, other than the deposition of Superintendent Crowley, neither party supplied the Court with copies of any deposition transcripts.  The Court relied on the parties' undisputed representations in their statements regarding the content of depositions.

[2] The record does not reveal when Plaintiff was first hired by the East Providence School Department.

(including superintendent) and East Providence failed to follow the procedures required by the 1994 reconciliation agreement and also discriminated against Plaintiff by giving her a substandard evaluation during the 2012-2013 school year and by placing a higher percentage of children with disabilities at her school than at any other elementary school in East Providence. Id. at 7-9 ¶¶ 11, 13-20, 23, 26-28.

*2015 Settlement Agreement*. In November 2015, Plaintiff settled the 2014 Case through the execution of two documents. First, on November 15, 2015, Plaintiff and East Providence entered into a Settlement Agreement ("2015 Settlement Agreement"). DSUF ¶ 6. Under the 2015 Settlement Agreement, the School Department agreed to pay Plaintiff a sum of money, to "create and fund an affirmative action position with duties and responsibilities similar to the current affirmative action officer for the City of East Providence" and to "fill that position using good governmental practices in light of the current ordinances, affirmative action plan and town charter." ECF No. 14-1 at 15 ¶¶ 2-3; DSUF ¶ 7. The 2015 Settlement Agreement included the provision that the City and School Department would "provide a joint statement to plaintiff that there will be no retaliation for bringing plaintiff's suit." ECF No. 14-1 at 15 ¶ 6; DSUF ¶ 7. Second, the parties executed a document titled "Full and Final Release of All Claims" ("Release"), which released all known and unknown claims that were the "subject matter" of the 2014 Case. ECF No. 14-1 at 2-3; DSUF ¶ 8. The Release was executed on December 8, 2015; it terminated all of Plaintiff's claims in the 2014 Case, including those based on the number of disabled children placed at Whiteknact and Plaintiff's substandard review. DSUF ¶ 8 & ECF No. 14-1 at 2.

*First FMLA Leave*. While the 2014 Case was pending, in June 2015, Plaintiff began a leave pursuant to the FMLA. PSUF ¶ 39. She took the FMLA leave because the anxiety caused

by the 2014 Case prevented her from working full days.  Id. ¶¶ 40-41; DSUF ¶ 12.  She worked

part-time from August 2015 through the end of 2015.  DSUF ¶ 12.  In January 2016, with the

2014 Case resolved, she resumed her full-time position as principal of Whiteknact.  PSUF ¶ 39.

    *East Providence Leadership Change*.  While Plaintiff was out and then working part-time

on FMLA leave, the East Providence School District underwent a complete leadership change.

DSUF ¶¶ 9-20.  First, on December 15, 2015, Defendant Kathryn Crowley was hired to be the

new superintendent of the district; she started immediately on a part-time basis and became full-

time in January 2016.  Id. ¶¶ 9, 11.  Meanwhile, Dr. Sandra Forand had been appointed assistant

superintendent in November 2015.[3]  PSUF ¶ 25.  And Dr. Celeste Bowler was hired to be the

second assistant superintendent in January 2016 with responsibility for oversight of elementary

schools; also in January 2016, Dr. Bowler was assigned to fill the newly created position of

affirmative action officer for the School Department.  DSUF ¶¶ 17, 19.  Dr. Bowler is an African

American woman who came to East Providence from a school district in Massachusetts, where,

among other duties, she had served for four years as the district's affirmative action officer.  Id. ¶

20.

    *First Interaction with Superintendent Crowley*.  Plaintiff had her first meeting with

Superintendent Crowley during December 2015.  It was a positive interaction.  Plaintiff avers

that, "[i]n the beginning of her tenure, Crowley was collegial by asking me to serve on a hiring

committee, and she sent David Britto as a support system for the Whiteknact students with

special needs."  ECF No. 22-1 at 27-28.  During this meeting, Superintendent Crowley told

Plaintiff that "she had wanted to bump up [Plaintiff's] pay to be commensurate with other

---

[3] Unlike Superintendent Crowley, Dr. Forand was not new to the East Providence School Department, although she had not been working there.  Prior to November 2015, she had been working "on loan" for the Rhode Island Department of Education ("RIDE") for three years.  DSUF ¶¶ 14-15.

districts"; she solicited Plaintiff's ideas on who should be her assistant principal (they agreed it should be Britto); and she asked if she could send (and did send) one of her graduate students to be mentored by Plaintiff.  Id. at 28-29.  However, soon after this first meeting, the incidents that Plaintiff labels as harassing and retaliatory began.

*Elmer Pina Question and Appointment of Dr. Bowler as Affirmative Action Officer*.  The next interaction between Plaintiff and Superintendent Crowley, on January 5, 2016, disturbed Plaintiff.  Specifically, Superintendent Crowley asked Plaintiff why Elmer Pina,[4] who is the affirmative action officer for the City of East Providence, could not also serve as School Department's affirmative action officer.  PSUF ¶ 3.  Plaintiff answered that it was part of their agreement and asked her to consult with the School Department lawyers.  Id.  Soon after, Dr. Bowler, who had also just started work in East Providence, was given the additional assignment to act as the School Department's affirmative action officer; however, Dr. Bowler had not been hired to fill the role, was not paid extra to perform the duties and, at her deposition, did not recall what the job description stated.  DSUF ¶¶ 17-19; PSUF ¶¶ 23-24, 35.  On January 19, 2016, Dr. Bowler sent out a district-wide email announcing that she would be serving "as the district's Affirmative Action and Civil Rights Officer."  PSUF ¶ 5.  Plaintiff believed this was a breach of the 2015 Settlement Agreement and that it was done to retaliate against her for entering into the 2015 Settlement Agreement.  PSUF ¶ 32.

*Rug and Wall Divider*.  Soon after she was asked whether Elmer Pina could serve as affirmative action officer, on January 15, 2016, Plaintiff asked for a rug and wall divider for a

---

[4] This question requires context.  The reader will recall that Plaintiff's 2015 Settlement Agreement with the School Department, which had only been signed a few weeks before these events, required the Department to "create and fund" the position of affirmative action officer "on its own."  ECF No. 14-1 at 15 ¶ 2.  This means that the Department must appoint someone other than the affirmative action officer (Elmer Pina) who was already employed by the City of East Providence.

special needs class.  Plaintiff felt she needed these items to properly educate students in the special needs classrooms.  Superintendent Crowley denied the request.  Id. ¶ 4.  Superintendent Crowley's response to Plaintiff's inquiry regarding why her request was rejected is undisputed:

> I am not a proponent of dividers in a room.  I think they are a detriment to supervision.  The rug was very expensive but if you feel a classroom really needs the rug send a rationale.

ECF No. 23-1 at 2.  Plaintiff has presented no evidence regarding any follow-up to this communication.

*Too Many Special Needs Students*.  As the principal of Whiteknact during the 2015-2016 school year, Plaintiff was responsible for four specialized classrooms for students with disabilities or special needs.  PSUF ¶ 17.  Plaintiff believes (and Defendants dispute) that the percentage of students with special needs at her school increased in the 2015-2016 school year, comprising 20% to 21% of the total students, while only 16% of the students at the next closest elementary school had special needs.  Id. ¶¶ 18-20.  There is no evidence that a surge of disabled students was transferred to Whiteknact after Plaintiff resumed her duties as its principal; to the contrary, Plaintiff's pleading in the 2014 Case establishes that the higher percentage of disabled students at Whiteknact was a long-standing issue.  ECF No. 22-1 ¶¶ 26-28.  The parties do not dispute that, after her first meeting with Plaintiff, Superintendent Crowley sent David Britto as a support system for the Whiteknact students with special needs.  Id. at 28; DSUF ¶ 21.  ("We agreed on David Britto.").

*Mishandling of Substitute Teacher*.  On March 1, 2016, Dr. Bowler questioned Plaintiff's determination that a substitute teacher, who Plaintiff believed was not following the curriculum, should be removed from her position.  Dr. Bowler met with the substitute teacher and Plaintiff, following which Dr. Bowler met with the substitute teacher alone.  PSUF ¶ 6.  As a result of Dr.

Bowler's meeting, the substitute teacher stopped working at Whiteknact; Plaintiff claims that Dr. Bowler's handling of the substitute teacher was bungled in that, when she left, the substitute took school materials, including mid-year testing for students. Id.

*"Demotion" to Principal of Pre-K Program.* During the 2015-2016 school year, RIDE was pushing its public schools to offer Pre-K instruction and offered a grant to assist with the development of such programs. DSUF ¶ 36. Soon after Dr. Bowler started in East Providence, in January 2016, she prepared an application for a RIDE grant to create a Pre-K school program for the East Providence School Department. Id. ¶ 37. In preparing the grant application, Dr. Bowler used Plaintiff's credentials as an experienced elementary school principal with the requisite certifications, including Pre-K certification as a principal. PSUF ¶ 7. Dr. Bowler did not tell Plaintiff that her credentials had been used in the grant application. Id. Superintendent Crowley knew that Plaintiff's credentials were being used to apply for the grant and agreed with Dr. Bowler's judgment to include them; in making this decision, Superintendent Crowley relied not only on Dr. Bowler's recommendation and Plaintiff's credentials, but also on her own (undisputed) conversation with Plaintiff, during which Plaintiff stated that she wanted to expand her experience and professional development. DSUF ¶¶ 41-42; ECF No. 22-3 at 9. Based on this application, RIDE awarded the grant to the East Providence School Department to establish a Pre-K program with more classrooms than any other school district. DSUF ¶ 37.

On April 25, 2016, Plaintiff was informed that Superintendent Crowley and Dr. Bowler had chosen her to be the founding principal for the new Pre-K program. PSUF ¶ 8. As principal of the Pre-K program, Plaintiff's salary would remain the same as when she was principal at Whiteknact.[5] Id. ¶¶ 14-15. They advised her that she had been chosen because she was the only

---

[5] Initially, Plaintiff pointed to the undisputed fact that the special education teacher who ultimately became principal of the Pre-K program was paid more than Plaintiff had been offered. However, this difference does not evidence

East Providence educator qualified.  PSUF ¶ 9.  Plaintiff had the requisite certification, including Pre-K certification as a principal, as well as experience as a principal, albeit at the elementary level, not as a pre-k principal.  DSUF ¶ 40.  Plaintiff declined the position.  DSUF ¶ 43.  East Providence leadership did not accept Plaintiff's refusal.  On May 7, 2016, the School Department advised her that she was being involuntarily transferred to the Pre-K principal position.  DSUF ¶ 43; PSUF ¶ 11.  After Plaintiff resigned in August 2016, another educator was assigned to be the founding Pre-K principal; while this individual had the correct certification, she was a special educator and lacked Plaintiff's extensive experience as an elementary school principal.  See PSUF ¶¶ 10, 16.

Despite the identical salary, Plaintiff considered the transfer from Whiteknact principal to Pre-K principal to be a demotion.  Id. ¶ 12.  The Pre-K program would have approximately one hundred and twenty-five students and fifteen staff, which contrasted unfavorably with three hundred students and seventy-five to one hundred staff at Whiteknact.  Id.; ECF No. 22-3 at 9. Plaintiff believed that she would also have significantly less control over curriculum and hiring and would be denied the ability to work after school.  PSUF ¶ 12.

*Substandard Evaluation*.  For the 2015-2016 school year, because Dr. Bowler was not trained in the Rhode Island teacher evaluation model, Dr. Forand was given the solo responsibility of conducting all of the principal job performance reviews and evaluations that RIDE required each school department to perform.  ECF No. 22-3 at 10; PSUF ¶ 27.  Under RIDE's evaluation process, meetings are supposed to be held at the beginning of the year, followed by three site visits completed throughout the year.  PSUF ¶¶ 27-28.  Because she was

_____

discrimination in that it is also undisputed that Superintendent Crowley succeeded in her plan of pushing through a salary increase for all principals (which increased the salary of the newly appointed Pre-K principal) soon after Plaintiff left.  ECF No. 23-2 at 16.  If Plaintiff had not resigned, her salary would also have been increased.

working on the project alone and because the new leadership team did not arrive until well after the start of the 2015-2016 school year, Dr. Forand did not begin the first site visits until January and February 2016, with the second site visits in April and May 2016, and the last in May and June, while "mid-year" conferences were held in mid-May. Id. ¶¶ 28-29. Consistent with all other principals, Plaintiff's first, second and third site visits were completed on January, April, and June and her "mid-year" conference was on May 11, 2016. Id. ¶ 29. During the "mid-year" conference, Plaintiff presented information to Dr. Forand that caused her to change at least one of Plaintiff's scores. DSUF ¶ 32. Plaintiff believes that the timing of her "mid-year" meeting was retaliatory.

Plaintiff received her final evaluation on June 20, 2016. It was prepared by Dr. Forand based on this process. It included the finding that Plaintiff was in need of improvement. PSUF ¶ 30. Although the evaluation process permitted Plaintiff to have a conference with Dr. Forand about the final evaluation, Plaintiff did not take advantage of this opportunity by scheduling a conference. DSUF ¶ 33. Despite her experience at the "mid-year" conference, at which Dr. Forand changed a score based on Plaintiff's input, Plaintiff believed the only way she could change this poor review was to file a lawsuit as she had done in 2014. PSUF ¶ 33. Plaintiff also believes that this review made her unable to apply for principal jobs where she currently lives in Florida because public school districts will only hire a principal who has a "meets expectations or exceeds expectations in their last two reviews." Id. ¶ 34; ECF No. 22-5 ¶¶ 3-4. Before East Providence submitted its principal evaluations to RIDE, Superintendent Crowley contacted Plaintiff to ask if she wanted to challenge the review; however, because Plaintiff brought her attorney to the meeting and the Superintendent was not permitted to participate in such a meeting

without the Department's attorney, the meeting was postponed. DSUF ¶ 35. Superintendent Crowley never heard from Plaintiff again, regarding any topic. Id.

*Second FMLA Leave and Resignation.* On the day after she received the poor evaluation, June 21, 2016, Plaintiff went back out on FMLA leave. PSUF ¶ 38. In a submission correctly challenged by Defendants as hearsay, her physician characterized her condition as caused by "retaliation and discrimination," prescribed a sedating medication to control Plaintiff's anxiety symptoms and opined that she was unable to work. Id. On August 2, 2016, Plaintiff submitted her letter of resignation to the East Providence School Department. DSUF ¶ 46. Plaintiff's attorney advised the Court at the hearing that Plaintiff has relocated to Florida and is still living there. It is undisputed that Plaintiff began submitting applications for positions in Florida in January 2016. Id. ¶ 48.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). The evidence must be in a form that permits the court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "[E]vidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth

which a factfinder must resolve." <u>Vasconcellos v. Pier 1 Imports (U.S.) Inc.</u>, C.A. No. 06-484T, 2008 WL 4601036, at *3 (D.R.I. Apr. 28, 2008).

In ruling on a motion for summary judgment, the court must examine the record evidence in the light most favorable to the nonmoving party; the court must not weigh the evidence or reach factual inferences contrary to the opposing party's competent evidence. <u>Tolan v. Cotton</u>, 572 U.S. 650, 660 (2014). In employment cases, summary judgment is appropriate when the party opposing the motion "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000); <u>Bonilla v. Electrolizing, Inc.</u>, 607 F. Supp. 2d 307, 314 (D.R.I. 2009). The motion must be denied if there is sufficient evidence from which a reasonable jury could infer that the adverse employment action was based on discriminatory animus or that the employer's articulated reason is a sham and the true reason is discriminatory. <u>Trainor v. HEI Hosp., LLC</u>, 699 F.3d 19, 28 (1st Cir. 2012); <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 421 (1st Cir. 1996).

## III.   EMPLOYMENT CLAIMS

### A.      Relevant Employment Law

Plaintiff's federal employment-based claims principally rely on 42 U.S.C § 1981, which prohibits discrimination in the "mak[ing] and enforce[ing]" of contracts. She alleges purposeful race discrimination, racial harassment and retaliation, resulting in a hostile work environment. To state a claim for purposeful discrimination, Plaintiff must show: (1) that she is a member of a racial minority, (2) that Defendants possessed an intent to discriminate on the basis of race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute. <u>King v. Friends of Kelly Ayotte</u>, 860 F. Supp. 2d 118, 127-28 (D.N.H. 2012). To state a racial

harassment claim, Plaintiff must establish that (1) she is a member of a protected class; (2) she experienced uninvited harassment; (3) the harassment was racially-based; (4) the harassment was so severe or pervasive as to create an abusive work environment; and (5) the harassment was objectively and subjectively offensive. Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002); see Rivera-Martinez v. Puerto Rico, No. 05-2605, 2007 WL 16069, at *3-4 (1st Cir. Jan. 4, 2007) ("Title VII was not intended to be a 'general civility code'; therefore, conduct must be extreme to be actionable."). And to state a claim for retaliation, Plaintiff must show that she complained of racial discrimination or harassment, that Defendants interfered with her ability to make or enforce a contract, and that her complaint and the interference are causally connected. CBOCS W., Inc. v. Humphries, 553 U.S. 442, 455-57 (2008); Pina v. Children's Place, 740 F.3d 785, 800-01 (1st Cir. 2014). Plaintiff's state-law-based employment claim[6] arises under the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, *et seq.* ("RICRA"), which is analogous to § 1981 in that it prohibits discrimination based on race in the making and enforcement of contracts. R.I. Gen. Laws § 42-112-1(a).

In addition to § 1981 and RICRA, Plaintiff also relies on FMLA, which prohibits retaliation for taking an FMLA leave, 29 U.S.C. § 2615(a)(2). To prevail on a claim for FMLA retaliation, a plaintiff must prove "by a preponderance of the evidence that the employer's

---

[6] Plaintiff's complaint also asserts a state law claim (Count VII) based on the Rhode Island Whistleblower's Protection Act, R.I. Gen. Laws § 28-50-1, *et seq.* The gravamen is similar to her other claims – that Defendants retaliated against Plaintiff for pursuing the 2014 Case. Plaintiff has abandoned this claim in that she has not sought to rebut Defendants' arguments challenging Count VII. In any event, this claim rises or falls based on the same tripartite decisional sequence laid out in McDonnell Douglas and progeny, Barboza v. Town of Tiverton, C.A. No. 07-339-ML, 2010 WL 2231995, at *9 (D.R.I. June 2, 2010). Therefore, if Plaintiff tries to revive her whistleblower claim before the District Court, and the Court is inclined to consider it, I recommend that it be dismissed for the reasons why I recommend judgment in favor of Defendants on the other employment-based claims. See Malone v. Lockheed Martin Corp., 610 F.3d 16, 23-24 (1st Cir. 2010) (without causal link between whistleblowing and some adverse employment action, claim fails as a matter of law).

adverse employment action was in retaliation for the exercise of protected rights."  See

Greenman v. Metro. Prop. & Cas. Ins. Co., C.A. No. 15-04ML, 2017 WL 9324760, at *13

(D.R.I. Mar. 22, 2017), adopted, C.A. No. 15-004-ML, 2017 WL 2438776 (D.R.I. June 6, 2017).

Despite material differences among these claims, for the sequence of decision-making

and the allocation of the burden of proof, all three look to the case law developed to interpret

Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) as established in the Supreme

Court's seminal decision, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[7]  Developed

for cases like this one, with no "smoking gun," McDonnell Douglas sets out a now-familiar

three-step, burden-shifting framework.

First, Plaintiff must shoulder the threshold McDonnell Douglas step that requires her to

overcome the burden of adducing a *prima facie* case.  To do so, she must demonstrate that there

is trial-worthy evidence to establish that she suffered an adverse employment action and that the

adverse action is causally connected either to her status in a protected class or to her having

engaged in protected activity.[8]  Evidence sufficient to establish a *prima facie* case creates a

presumption of discrimination and moves the analysis to the second McDonnell Douglas step,

where the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for the

adverse action.

If Defendants clear step two, the third and final step places the burden again on Plaintiff

to present trial-worthy evidence sufficient to amount to a preponderance that the proffered reason

---

[7] Section 1981 triggers the same substantive standards and methods of proof that apply to Title VII claims.  Pina, 740 F.3d at 796.  FMLA retaliation claims also proceed using the Title VII framework.  Greenman, 2017 WL 9324760, at *13.  And state employment discrimination statutes, including RICRA, are interpreted through the federal legal framework.  McElroy v. Fid. Invs. Institutional Servs. Co., Inc., 298 F. Supp. 3d 357, 364 n.8 (D.R.I. 2018); Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006).

[8] Defendants do not dispute that Plaintiff's race places her in a protected class or that her prosecution and settlement of the 2014 Case and her FMLA leaves constitute protected activity.

for the adverse action is a sham or mere pretext and that the true reason is unlawful discrimination or retaliation. Young v. United Parcel Serv., Inc., 135 S. Ct 1338, 1354-55 (2015); Pina, 740 F.3d at 796. Pretext can be proven by evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). "[P]retext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks[,] . . . something that is put forward to conceal a true purpose or object." Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R., 404 F.3d 42, 45 (1st Cir. 2005). Ultimately, the court must consider whether "there is a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Ahmed v. Johnson, 752 F.3d 490, 497 (1st Cir. 2014) (quoting Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012)).

## B. Employment Claims Analysis

Beginning with the first McDonnell Douglas step, which requires proof of a *prima facie* case, Defendants vociferously contend that Plaintiff has proffered no evidence from which a fact finder could infer any adverse employment action, never mind one that is causally linked to her race or a protected action. In response, Plaintiff concedes that, other than the transfer to the Pre-K program and her substandard evaluation, none of the incidents she complains of, viewed in isolation, is enough to constitute an adverse employment action. Nevertheless, she argues that she has presented enough to demonstrate that the cumulative effect of what happened during the six-month period in issue permits a finding that she was exposed to a severe or pervasively hostile work environment. Noviello v. City of Boston, 398 F.3d 76, 89, 92 (1st Cir. 2005)

("[p]laintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment" to base *prima facie* case on hostile work environment).

To prove an actionable hostile work environment, a claimant must clear a high bar. Neither petty indignities, Colman v. Faucher, 128 F. Supp. 3d 487, 500 (D.R.I. 2015), nor the "ordinary, if occasionally unpleasant, vicissitudes of the workplace," Franchina v. City of Providence, 881 F.3d 32, 46 (1st Cir. 2018), are enough. Rather, while the issue of whether the working environment has been made objectively and subjectively abusive is not "mathematically precise," Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993), a hostile work environment must be so "severe or pervasive to alter the conditions of the victim's employment"; it is not created by isolated incidents or offhand comments. Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003). The factors guiding the court's determination are the severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to merely offensive, and the extent to which it unreasonably interferes with an employee's work performance; "[e]ach hostile work environment claim, then, is necessarily evaluated on a case-by-case basis." Franchina, 881 F.3d at 46. Measured against this legal standard, Plaintiff's proof does not come close to meeting the mark.

Plaintiff's first incident is Superintendent Crowley's question why Elmer Pina could not be the affirmative action officer, followed by the announcement that Dr. Bowler would fill the position. The undisputed evidence establishes that the question was asked very soon after Superintendent Crowley assumed the full-time leadership of the East Providence School Department, at a point when the 2015 Settlement Agreement had just been signed and the School Department had not yet figured out how to comply. Plaintiff tries to characterize the question as

insidious because it demonstrates that the new Superintendent was aware of the 2015 Settlement Agreement. However, to comply with the 2015 Settlement Agreement, Superintendent Crowley had to be aware of it; her knowledge means only that the School Department was appropriately focused on compliance with its contractual commitment. Otherwise, Plaintiff has failed to suggest a scintilla of evidence permitting the inference that this question was anything other than a respectful inquiry of Plaintiff about her understanding of the correct interpretation of the 2015 Settlement Agreement. This incident has none of the trappings of a hostile work environment. Franchina, 881 F.3d at 46-47. Nor does the selection and announcement of Dr. Bowler for the affirmative action position,[9] which followed shortly after, somehow amount to harassment of Plaintiff, particularly where (until the filing of this lawsuit) there is no evidence that Plaintiff ever told Superintendent Crowley, or anyone, that she interpreted the 2015 Settlement Agreement as barring East Providence from filling the position with a well-qualified person like Dr. Bowler.

Similarly, none of Plaintiff's other incidents, whether viewed in isolation or cumulatively, come close to permitting the inference of offensiveness that reaches the requisite level of pervasiveness and/or severity to constitute actual harassment. Id. at 46. For example, the denial of Plaintiff's request for a rug and wall divider is inconsequential. At worst, this evidences a differing philosophy on how to optimize a classroom – not harassment or discrimination. Nor does Dr. Bowler's isolated mishandling (as Plaintiff perceived it) of a substitute teacher transfer rise to the level of anything more than the "vicissitudes of the workplace." Id. And Dr. Bowler's inclusion of Plaintiff's credentials in the East Providence Pre-K grant application without first seeking her permission might deviate from some

---

[9] Whether this was a breach of the 2015 Settlement Agreement is a different question; that is addressed infra.

unspecified best practice[10] or courtesy, but it simply is devoid of any indicia permitting the inference of harassment, discrimination or, as Plaintiff contends, an attempt to punish Plaintiff for exercising her legal rights. Likewise, Plaintiff's reprise of her claim that Whiteknact was assigned more than its fair share of children with special needs is utterly undeveloped as an act of harassment or retaliation in the relevant period.[11] Coupled with Plaintiff's admission that one of Superintendent Crowley's first actions was to reassign a special educator to assist Plaintiff with the load, it falls flat, whether viewed in isolation or as part of a pattern to create a hostile work environment. Finally, Plaintiff's complaint about the timing of her mid-year conference is embedded in an undisputed factual record establishing that Plaintiff's conference was held in the exact same time-frame as those for all other East Providence principals; there is not a whiff of discrimination, harassment or retaliation. In short, the Court should reject as unsupported by any trial-worthy evidence Plaintiff's contention that the environment resulting from the cumulative effect of these incidents was so severe as to amount to a constructive discharge. See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) (for adverse action arising from constructive discharge, claimant must show working conditions "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign").

Somewhat more logically, Plaintiff points to her "demotion" to the position of founding principal of the new Pre-K program and her substandard review as adverse employment actions

---

[10] At oral argument, Plaintiff conceded that the use of an employee's credentials in a grant application without consent is not a violation of any established norm.

[11] In the 2014 Case and in this case, Plaintiff has alleged that, since 2012, Whiteknact was serving too many special needs children and that they were placed there to harass her. Plaintiff's only support for this factual assertion in this case is an unexplained, incomprehensible and unauthenticated chart apparently prepared (but not verified) by Plaintiff herself. See PSUF ¶¶ 18-20. Even if the Court were to consider this inadmissible proffer, it purports to reflect the percentage of special needs students during the entire school year and not placement decisions made after December 2015. Plaintiff's evidence is insufficient to permit the inference that placement of special needs students increased at Whiteknact in response to Plaintiff's return to actively serving as its principal beginning in December 2015.

sufficient to meet the first prong of a *prima facie* case.  Nelson v. Univ. of Me. Sys., 923 F.

Supp. 275, 281 (D. Me. 1996) ("adverse employment action . . . must, [] at a minimum, impair or

potentially impair the plaintiff's employment in some cognizable manner").  Defendants contend

that the Court would have to stretch to find that either of these qualifies as an adverse

employment action.  See Davis v. Town of Lake Park, 245 F.3d 1232, 1241-42 (11th Cir. 2001)

(collecting cases holding that substandard performance evaluation rarely constitutes adverse

employment action), overruled on other grounds as recognized by, Crawford v. Carroll, 529 F.3d

961, 974 (11th Cir. 2008); Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 885 (6th Cir. 1996)

("reassignments without salary or work hour changes do not ordinarily constitute adverse

employment decisions").  Nevertheless, based on Plaintiff's allegation that, as Pre-K principal,

her ability to work after school would be altered (albeit with no salary impact), and her averment

that her review affects her ability to get comparable jobs in Florida, I will assume (without

deciding) that they squeak by.  Therefore, as to these two actions, I move to the second prong for

a *prima facie* case, that is, a causal link to Plaintiff's protected status or conduct.  To meet this

element, Plaintiff relies only on temporal proximity, which can be enough at this phase of the

McDonnell Douglas framework.[12]  Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff,

511 F.3d 216, 224 (1st Cir. 2007) ("'temporal proximity' between appellant's allegations of

discrimination . . . and his termination . . . is sufficient to meet the relatively light burden of

establishing a prima facie case of retaliation").

 The problem is that Plaintiff's evidence of a temporal proximity nexus rests on a shaky

foundation – neither the five months that elapsed between the termination of the 2014 Case in

---

[12] At the third step in the McDonnell Douglas formula, temporal proximity cannot carry the day.  Reilly v. Cox Enter. Inc., C.A. No. 13-785 S, 2016 WL 843268, *3 (D.R.I. Mar. 1, 2016).  That is, temporal proximity is insufficient to support an inference of discriminatory animus.  Greenman, 2017 WL 9324760, at *12.

November 2015 and April 2016, when Plaintiff was given the assignment to be the Pre-K principal,[13] nor the seven-month hiatus between the 2015 Settlement Agreement and the substandard review, meet what the case law suggests is close enough.  See, e.g., Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 32 (1st Cir. 2019) ("The gap of four months, on its own, is not 'very close' for establishing causality.").  "Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."  Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("cases that accept mere temporal proximity . . . to establish a prima facie case uniformly hold that the temporal proximity must be very close").  Moreover, in this instance, "[t]he larger picture undercuts any claim of causation."  Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).  That is, at least as to the alleged "demotion," Plaintiff has proffered nothing to dispute the evidence establishing that the decision to transfer Plaintiff to the Pre-K program was based on her unique combination of the right certifications and experience, coupled with her stated desire for new opportunity, and not her pursuit of the 2014 Case.

Nevertheless, notwithstanding the tepid quality of Plaintiff's *prima facie* case based on her "demotion" to Pre-K principal and her substandard evaluation, the Court will presume that Plaintiff has proffered sufficient evidence to avert summary judgment at step one.  Greenman, 2017 WL 9324760, at *7; Vasconcellos v. Pier 1 Imports (U.S.), Inc., CA No. 06-484T, 2008 WL 4601036, at *4 (D.R.I. Apr. 28, 2008).  Therefore, the analysis continues.  Next is the second step of the McDonnell Douglas triad, which requires consideration of East Providence's reason for each alleged adverse action.

---

[13] One might argue that the "demotion" adverse action occurred sooner, in January 2016, when Plaintiff was named in the grant application for the Pre-K program.  But this way of looking at the timing makes little sense in that this was not an action that affected Plaintiff at all.  The adverse impact did not occur until Plaintiff said she did not want to be the Pre-K principal and Superintendent Crowley decided to force her to make the move.

In proffering a legitimate non-discriminatory reason for Plaintiff's substandard review, Defendants rely on the affidavit of Dr. Forand, who performed the evaluation. ECF No. 13-2 at 18-20. In it, Dr. Forand explained that Plaintiff's review was conducted according to the mandatory rubric created by RIDE, with the timing skewed by Dr. Bowler's inability (because she had not been trained on RIDE's process) to assist and by the commencement of the process after Dr. Forand started (in November 2015) instead of in September. Id. ¶¶ 3-11. As with all of the principal reviews, Dr. Forand relied on her preliminary meetings and site visits with Plaintiff, as well as on the feedback sessions with Plaintiff that she conducted at the end of each visit to inform the review. Id. ¶¶ 12-13. As with all other principals, Dr. Forand offered Plaintiff an opportunity to have an end-of-year conference about the review before it was sent to RIDE, which Plaintiff (unlike others) did not schedule. Id. ¶ 14. To explain the decision to assign Plaintiff the principalship of the newly created Pre-K program, Defendants rely on an array of evidence, particularly the testimony of Superintendent Crowley that the East Providence School Department considered the Pre-K program to be an important initiative, that Plaintiff had both the requisite certification and extensive experience as a principal of an elementary school, and that Plaintiff had requested an opportunity to expand her experience and professional development, which Dr. Crowley believed was aligned with the Pre-K program. Based on this evidence, I find that Defendants have more than satisfied their obligation to proffer a legitimate non-discriminatory reason for each of these potential adverse actions. Therefore, McDonnell Douglas analysis proceeds to step three.

At step three, Plaintiff resumes the burden, now to present admissible evidence that will permit a finding that the proffered reason is a pretext and that the real reason was discrimination. Villanueva v. Wellesley Coll., 930 F.2d 124, 131 (1st Cir. 1991) (claimant required to adduce

sufficient evidence from which trier of fact could conclude that articulated reason for adverse decision was "obviously weak or implausible," or that standards were "manifestly unequally applied"); Morrissette v. Honeywell Bldg. Sols. SES Corp., C.A. No. 10-12-ML, 2011 WL 3652428, at *3 (D.R.I. Aug. 17, 2011) ("the ultimate burden of proof rests upon the plaintiff to show by a preponderance of the evidence that the defendant's rationale for the [action] is a pretext for . . . discrimination"). To meet this burden, Plaintiff has presented nothing more than the undisputed fact that a person less qualified than Plaintiff was chosen to launch the Pre-K program after Plaintiff resigned. This is not even enough to suggest that reasonable people could differ on the appropriateness of Superintendent Crowley's selection of Plaintiff for the Pre-K principal; in any event, evidence that the employer could have made a wiser choice is not enough to establish pretext. Villanueva, 930 F.2d at 131. Similarly, Plaintiff points to nothing to establish that the content of her substandard review was based on race or retaliation. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999) (not actionable for employer to provide inaccurate, even unfair, performance assessment and to demote employee on that basis; employee must present evidence that content of review was predicated on race or another legally improper motive). Thus, Plaintiff has failed to sustain her burden of "elucidate[ing] specific facts which would enable a jury to find that the reason given [for either or both of Defendants' actions] is not only a sham, but a sham intended to cover up the employer's real motive." Mesnick v. Gen. Elec. Co., 950 F. 2d 816, 823-24 (1st Cir. 1991).

One issue remains. Plaintiff claims that East Providence's actions were in retaliation for her two FMLA leaves: first, the leave begun in June 2015 pursuant to which Plaintiff worked part-time from August until December 2015, and second, the leave she took beginning on June 21, 2016. The latter claim simply makes no sense; all of the challenged conduct happened before

the second FMLA leave. As to the first leave, Plaintiff alleges that she ended an FMLA-protected period of working part-time in December 2015, and in January 2016, all of the incidents began, starting with the Elmer Pina question. To support the FMLA retaliation claim, she relies on the same circumstances and adverse employment actions (the "demotion" and the substandard review) that she contends were so severe and pervasive as to create a hostile work environment, ultimately forcing her to resign. For the same reasons discussed above, the circumstances do not amount to an adverse employment action because they are insufficient to give rise to a hostile work environment and the "demotion" and substandard review do not permit the inference of harassment, discrimination or retaliation and lack any indicia from which a fact finder could conclude that Defendants' explanation for the actions was a pretext for FMLA retaliation. See Greenman, 2017 WL 9324760, at *12 (plaintiff must show that employer's stated reason for adverse action was pretext for retaliating against her for having taken protected FMLA leave); Domenichetti v. Premier Educ. Grp., LP, Civil Action No. 12-cv-11311-IT, 2015 WL 58630, at *9 (D. Mass. Jan. 5, 2015) (same).

Based on the foregoing, the FMLA retaliation claim also fails; judgment on it and on all of Plaintiff's employment-law claims, both state and federal, should enter in favor of Defendants.

## IV.    BREACH OF CONTRACT CLAIMS

"Settlement agreements are treated as contracts and enforced under the rules governing contracts generally." United States v. Fairway Capital Corp., 433 F. Supp. 2d 226, 244 (D.R.I. 2006) (citing Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999)). Whether a contract is ambiguous is a question of law; the Court may consider all evidence before it when deciding this question. See Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996). "In determining whether or not a particular contract is ambiguous, the court should read

the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" Haviland v. Simmons, 45 A.3d 1246, 1258 (R.I. 2012) (quoting Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 558 (R.I. 2009)). "[A] contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Rotelli, 686 A.2d at 94. If the Court determines that an ambiguity exists within the contract, then summary judgment is inappropriate and the proper construction of the contract is a question of fact for the fact-finder. T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc., 958 F. Supp. 2d 315, 321-22 (D.R.I. 2013). However, it is the words used, not a party's interpretation, that controls. Aetna Cas. & Sur. Co. v. Sullivan, 633 A.2d 684, 686 (R.I. 1993).

The key provision of the 2015 Settlement Agreement is paragraph 2, which states:

> The school department will, on its own, create and fund an affirmative action position with duties and responsibilities similar to the current affirmative action officer for the City of East Providence.

ECF No. 22-1 at 15 ¶ 2. The next paragraph of the contract amplifies on how the City should discharge this obligation: "The school department will fill that position using good governmental practices in light of the current ordinances, affirmative action plan and town charter." Id. ¶ 3. The issue[14] presented by Count I of Plaintiff's complaint is whether this language is unambiguous and supports Defendants' interpretation that it permitted the East Providence School Department to create and fund the position by adding duties similar to those of the City's affirmative action officer to the portfolio of a highly qualified individual already holding a prestigious position of respect in the Department – Dr. Bowler. Or, as Plaintiff argues, is it

---

[14] The other issue posed by Count I arises from Plaintiff's contention that Defendants' retaliatory conduct breached East Providence's promise to "provide a joint statement to plaintiff that there will be no retaliation." ECF No. 22-1 at 15 ¶ 6. Apart from the problem that Plaintiff does not dispute Defendants' representation that East Providence complied with the letter of this provision of the 2015 Settlement Agreement in that the joint statement was provided, more substantively, this aspect of the breach of contract claim founders because of the absence of any trial-worthy evidence that retaliation occurred.

properly interpreted as prohibiting such an approach, instead requiring the Department to create a standalone position that must be filled by an individual who has no other duties.[15]  Or is the clause ambiguous, requiring this claim to proceed to trial.[16]

In support of her argument that the words of the 2015 Settlement Agreement mean that the affirmative action officer position must be filled by one person who has no other duties, Plaintiff directs the Court to Justice Williams' decision, <u>Town of Smithfield v. Local 2050, Int'l Ass'n of Firefighters, AFL-CIO</u>, No. CA 00-3650, 2000 WL 1273904, at *5 (R.I. Super. Aug. 11, 2000).  She argues that the case interprets the term "position" as meaning "a job."  While <u>Town of Smithfield</u> certainly uses the word "position" interchangeably to mean "a job," the decision is not helpful to Plaintiff in that it sheds important light on how courts should interpret municipal agreements affecting who may be placed in a "position."  It makes clear that, when the public interest is in issue, a municipal contract should not be construed as containing constraints on the exercise of officials' discretion regarding who should fill a position unless the words used by the parties in drafting the document specifically compel that result.[17]  <u>Id.</u> at *4-5.

---

[15] At her deposition, Plaintiff testified that she also believes that the 2015 Settlement Agreement was breached because the affirmative action officer has to be "independent" of the School Department, not answerable to the Superintendent.  This requirement does not appear in the document.  Further, the contract stipulates that the duties and responsibilities should be "similar" to the City's affirmative action officer, who is not independent, but reports to the City Manager.  Revised Ordinances of the City of East Providence, Rhode Island, § 11-151(a).  Plaintiff's argument to this Court did not rely on this interpretation.  If she reverts to it, I recommend that it be rejected.

[16] During the summary judgment hearing, the Court, *sua sponte*, raised the question of Plaintiff's standing to seek an injunction to enforce a contract with no sunset clause that affects the governance of a community in which she no longer lives.  I declined Plaintiff's offer to brief this issue based on my finding that the words used in the 2015 Settlement Agreement are not ambiguous, and that they permit East Providence to use good governmental practices to assign the position either to a qualified individual who is filling other positions, or to an individual who has no other duties, in the discretion of the Superintendent, guided by the City's affirmative action plan, ordinances and charter.  If the District Court believes this issue should be addressed, Plaintiff should be afforded an opportunity to file a brief.

[17] <u>Town of Smithfield</u> holds that it was error for an arbitrator to read limitations into a collective bargaining agreement that had the effect of impairing the "discretionary ability to transfer, hire or assign anyone within the [Fire] Department" and "distort[ing] the [Fire Department] Chief's flexibility for filling an important position such as the EMS Coordinator."  <u>Id.</u> at *5.  The court held that such an expansive interpretation, which "would severely tie

Like the collective bargaining agreement in <u>Town of Smithfield</u>, the 2015 Settlement Agreement is a municipal contract that does not contain words clearly specifying that the "position" cannot be filled by a preexisting employee who already holds a different "position." Pursuant to <u>Town of Smithfield</u>, it would be error to read this concept into the 2015 Settlement Agreement unless it is clearly there because such an interpretation would constrain the "discretion" and "distort" the flexibility of East Providence's Superintendent to fill the position in the way that she judges is most consistent with the needs of the School Department and the City's affirmative action plan. <u>Id.</u> at *5; <u>see</u> Charter of the City of East Providence, Rhode Island, § 10-3(3-4) (requires superintendent to administer the public schools). Indeed, far from requiring that the position be filled by someone who does nothing else, the 2015 Settlement Agreement states only that the filling of the "position" must be accomplished through the "us[e of] good governmental practices," reinforcing the intent of the parties to preserve discretion and flexibility to get the best person for the job. Importantly, Plaintiff does not dispute that the duties assigned to Dr. Bowler are "similar" to those assigned to Elmer Pina, the City's affirmative action officer, nor does she assail Dr. Bowler's credentials, nor does she contend that Dr. Bowler's selection is inconsistent with good governmental practices or with the City's affirmative action plan.

To support her argument that the words used nevertheless require the *de novo* hiring of a single person to fill only the affirmative action position, Plaintiff asks the Court to interpret the term "position" as carrying the implication that it refers to a discrete job that only one person may fill. This flies in the face of the plain meaning of the word, which Plaintiff correctly points out simply means "a job." <u>Position</u>, Lexico, available at

---

the hands of the administration in filling the position," cannot square with the parties' intent when a municipality is involved. <u>Id.</u>

https://www.lexico.com/en/definition/position ("A job.").  Nothing inherent in this meaning implies that one person is precluded from holding two or more positions; to the contrary, for one person to hold multiple positions is common, including in the educational arena.  See Putnam v. Reg'l Sch. Unit 50, No. 1:14-cv-00154-JAW, 2015 WL 5440783, at *2 (D. Me. Sept. 15, 2015) (per municipal contract, one individual held "a number of teaching and administrative positions").

Mindful of the guidance from Town of Smithfield that a court must eschew an interpretation that curbs the discretion of public officials to make the best choice, and of the holding of Putnam that an educator may hold more than one "position," I decline Plaintiff's invitation to impose an interpretative overlay that goes beyond the words of the contract.  Nor do I find any ambiguity: East Providence's contractual obligation was to create the "position" of affirmative action officer, with duties "similar" to those assigned to the affirmative action position for the City, and to deploy good governmental practices to fill it.  That is what it did. There is no breach.  I recommend that judgment enter in favor of Defendants on Count I, Breach of Contract.

A coda: I recommend that Count I should also be dismissed because Plaintiff concedes that she has no damages arising from the selection of Dr. Bowler as affirmative action officer. Under well-settled Rhode Island law, some damage or harm arising from the breach is an essential element of a breach of contract claim.  Petrarca v. Fid. & Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005).  Plaintiff's decision to seek only the equitable remedy of specific performance does not cure this deficiency – tangible harm of an irreparable nature is "an essential prerequisite for a grant" of specific performance.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000).

## V.    CONCLUSION

Based on the foregoing, I recommend that the Court grant Defendants' motion for summary judgment (ECF No. 13).

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 11, 2019